(No. 19411.—

MAGGIE FEY OFF *et al.* Plaintiffs in Error, *vs.* THE EXPOSITION COASTER, INC., *et al.* Defendants in Error.

*Opinion filed June 19, 1929—Rehearing denied October 8, 1929.*

JOSEPH A. WEIL, and JOSEPH F. BARTLEY, (HERBIG YOUNGE, of counsel,) for plaintiffs in error.

GEORGE W. HUNT, and CHARLES C. DICKMAN, for defendants in error.

Mr. CHIEF JUSTICE FARMER delivered the opinion of the court:

This court granted a writ of *certiorari* to plaintiffs in error to bring up for review the record wherein the Appellate Court for the Second District reversed a decree of the circuit court of Peoria county granting the relief prayed by complainants in the bill, plaintiffs in error here, for an injunction restraining the operation of certain amusements near the dwellings of plaintiffs in error. The complainants in the bill were Maggie Fey Off, her four sons, Charles D., Walter, Clifford and Clarence Off, Harry J. Schmoeger and George B. Rookwood. Mrs. Off is the widow of Charles J. Off, who died testate about 1920, leaving a life estate in 17 acres of land to his widow, with remainder in fee to their four sons, who were also appointed trustees. Mrs. Off lived on the land in a very substantial residence, which cost her husband approximately $25,000 to construct. The dwelling was situated 242 feet west of the east line of the Off premises, which joined the property upon which the

amusements complained of were operated. The residence of Clarence Off, which cost $15,000, is located north of his mother's dwelling and about 219 feet west of the amusement property. Complainant Rookwood owned the residence in which he lived, on Reservoir boulevard. It is not far from the amusements complained of. He testified the construction cost of the house two years before that was $17,000. Reservoir boulevard is a street which extends east from Knoxville avenue, passing the entrances to the Off premises and to the property where the amusements were conducted. Complainant Schmoeger testified that he owned and resided in a residence on Reservoir boulevard not far from the entrance to the amusement grounds and that his residence was of the value of $18,000. The premises on which the amusements are located were about 1895 the property of a corporation formed to maintain a racetrack, to improve and develop agricultural, horticultural and mechanical arts, and comprised about 140 acres. Charles J. Off, deceased, was interested in the Peoria Agricultural and Trotting Society and became the grantee, afterwards, of the property. Thereafter the premises were used for holding races, exhibiting animals, such as horses, hogs, cattle and sheep, and part of the premises was also used by the National Implement and Vehicle Company, which purchased 120 acres of the land from Charles J. Off. The National Implement and Vehicle Show was incorporated for conducting amusements, entertainments, carnivals, fairs, races, exhibitions, etc., and the name was subsequently changed to Greater Peoria Exposition, which is one of the defendants in this case. That corporation leased to John A. Miller and Scott C. Diller that part of its property whereon the amusements complained of were being conducted. Miller and Diller organized two corporations,— one the Exposition Coaster, Inc., and the other the Exposition Amusement Shelter,—and began the work of constructing the amusements, and subsequently assigned the

lease to the Exposition Amusement Shelter, one of the defendants. The amusements complained of occupy the land leased by the Greater Peoria Exposition to Miller and Diller in 1926, and is approximately 650 feet north and south by 300 feet east and west, and adjoins the Off property on the east. It is reached by an entrance on the south side, where it fronts Reservoir boulevard, and has an entrance on the north end, which is reached by the Knoxville avenue road. The premises are outside the city limits of the city of Peoria, and contain a roller coaster, shooting gallery, tipsy house, a device called a "dodgem," a dance hall, in connection with which an orchestra furnishes music for dancing, a merry-go-round, a cat's meow, and other amusements. The roller coaster consists of a wooden track suspended on scaffolding, with a series of inclines, the highest point being 50 feet in the air. Carriages with a seating capacity of twelve persons run on the track. They are drawn by machinery to the highest point on the track and then travel by their own momentum up and down the inclines. The entire length of the track is 1200 feet and is traveled in about a minute. The amusement called "dodgem" consists of a floor about 75 feet square upon which thirty electric cars are driven, and when in operation they bump into and collide with each other and make a great noise, due to the collision and bumping, rolling on the metal floor and the screams of the occupants thereof. One of the amusements was a large dance hall permitting several hundred people to dance at one time while the orchestra played dance music therefor. The amusements, which we will not further describe, require a large space for parking automobiles driven by persons attending said amusements, and such space has been provided by defendants. These and other facts were alleged in the bill, which was answered by all the defendants substantially denying the material allegations of the bill.

After replication filed the cause was referred to a master in chancery to take the testimony and report his con-

clusions of law and fact. Eighteen witnesses testified on behalf of complainants, including complainants themselves, and thirty witnesses testified on behalf of defendants, many of them being officers, employees and patrons of the amusement company. A few of them testified they had occupied places near the residences of complainants for the purpose of testing the extent of the noise made when the park and amusements were in full operation. The master reported his conclusions of law and fact and recommended a decree as prayed in the bill, except that he reported the Exposition Coaster, Inc., was not shown to be liable for the operation of the Exposition Amusement Shelter, and he recommended as to that defendant the bill should be dismissed. Objections were overruled by the master and exceptions to the report were overruled by the chancellor. A decree was entered as recommended, from which the defendants below appealed to the Appellate Court, where the decree was reversed.

The evidence is rather voluminous. It is well settled that a business which is not a nuisance *per se* may be enjoined by a court of equity, if the case is free from substantial doubt, without first establishing in an action at law that the business is a nuisance. If the right to relief is doubtful either as to the law or the character of the facts proved, equitable relief will not be granted. (*Phelps* v. *Winch,* 309 Ill. 158; *Wente* v. *Commonwealth Fuel Co.* 232 id. 526.) In the *Phelps case* it was sought to enjoin the defendants from operating a dancing pavilion and maintaining entertainments therein on the ground that they disturbed the quiet and peace of the complainants. The case is very strikingly similar to the present case, only to our minds the evidence in the instant case in support of the bill is more conclusive than it was in the *Phelps case.* We do not deem it necessary to discuss at length the right of a court of equity to enjoin a business which is not a nuisance *per se* if the manner in which the business is operated seri-

ously injures the premises of the complainants and interferes with the physical comforts of ordinary people. This is not denied. In such a case, where the complainant is a home owner, the damages cannot be adequately compensated in a suit at law, and equity will grant the injunction. The Supreme Court of Michigan quoted with approval in *Edwards* v. *Mining Co.* 30 Mich. 48, from Judge Cooley, that "no man holds the comfort of his home for sale—no man is willing to accept in lieu of it an award for damages." The complainants in this case were home owners residing in their homes, and their right to sustain a bill in equity for injunction is sustained by numerous authorities of this and other courts, which we will not take the space to cite.

Walter Off testified that between his mother's house and the amusement park is a grass plot, upon which they formerly spent a good many evenings, but that it is no longer used in that way because of the noises from the park. The noise from the roller coaster sounds like an electric train running over a trestle. He said you could hear the shooting gallery and could hear the bullets hitting the metal backgrounds and the noise of the rifles. The merry-go-round made not so loud a noise, but taken in connection with the other devices a lot of noise was made, the sum total of which was a roaring effect extremely loud, so that conversation in the witness' back yard had to be in a loud tone of voice. The noise could be heard in the house when the windows were closed and interfered with ordinary conversation. The shrieking of persons using the amusements was also plainly heard. Clarence Off testified the noises were such that he could not sleep while the amusements were in operation. He had closed every window and door in the house and had then been unable to sleep on account of the noise. Mrs. Off testified that when the park was in operation she never slept until it closed because the noise was so dreadful, and that when she wanted a good night's rest she

went into town to get it. She had tried every room in the house and could not find a peaceful room to sleep in while the amusements were going on. She could hear it through closed windows. Ordinary conversation in her home and on the porch was interfered with. Bright electric lights located at the entrance of the park and near the crazy house shone into her property, and she always drew the shades in several rooms because they made the rooms so light. People who were enjoying the amusements screamed and shrieked, and it sounded like an Indian reservation during a war dance. Charles D. Off testified he attempted to sleep in his mother's home but was unable to do so because of the noise of the amusements; that the noise interefered with the ability to carry on a conversation. Chris Straesser testified he had visited Mrs. Off's residence once or twice every two weeks and had stayed as late as ten o'clock in the evening. He testified the amusements made a conglomeration of noises and that they interfered with ordinary conversation in the Off home and on the porch. A Mrs. Vorhees testified to substantially the same thing about the noises. Lucy Clegg Miller visited the Off home almost weekly and had stayed there at night. She testified that many nights she had not slept until after one or two o'clock in the morning. Mrs. Wind, L. J. Robinson, B. C. Dimmitt, F. L. Ticknor, complainant Rookwood and complainant Schmoeger substantially corroborated this testimony. A Mrs. Lambert testified for complainants that on the Rookwood premises the noise was a rolling, roaring noise, like cars running down tracks. The people using the amusements made almost as much noise as the amusements. When the amusements were running one had to speak louder. The witness resided at the residence of Rookwood, and said after they retired at night they could hear the noise at the park and that it disturbed their sleep, and especially of small children.

The witnesses who testified for defendants were in greater number than those who testified for complainants. None of defendants' witnesses were ever placed in the position of complainants' witnesses. Defendants' witnesses who testified about the noises being almost inaudible at complainants' premises did not go into the premises and none of them ever slept there and they were on the premises only for a brief period. The president of the Greater Peoria Exposition, three directors, a park policeman, an employee of the Exposition Amusement Shelter, all or some of whom stood on the Off property near the Clarence Off residence and listened to the noises, testified for defendants. The president of the Greater Peoria Exposition testified he heard the roller coaster trains on the track and the sounds were like a train passing in the distance. He testified one could hear the dodgem. He also heard shrieks, which were most often from women. There were all sorts of modulations with reference to shrieks. They shrieked as if highly amused or thrilled. Over complainants' objection he was allowed to answer that the noises he heard would in his opinion not affect the sensibilities of ordinary people. He admitted on cross-examination that he supposed he was basing his opinion pretty much on his interest in the case. One of the directors admitted he was partially deaf. We think it was not competent to allow the witness to give his opinion as to whether the noises were sufficient to affect the sensibilities of ordinary people. That was a question which the court had to decide and should not have been submitted to the witnesses. It is our opinion that the noises described would unquestionably affect the sensibilities of ordinary people in the enjoyment of their homes. That the territory in the vicinity of the homes of complainants was not a closely built-up territory could be of no importance. In the *Phelps case* the premises of complainants and of defendants were at a summer resort, which could not be deemed of more importance than a permanent home.

108

The weight and preponderance of the evidence we think was decidedly in favor of complainants. The cost to defendants of construction of the amusements cannot be considered. A business that is expensive to construct, which disturbs the peace and comfort of persons of ordinary sensibilities, cannot be accorded greater rights than a business which is not so expensive. Defendants' business was not an unlawful business if it was conducted in a manner so as not to disturb the peace and quiet of home owners in the vicinity, but the fact that they expended a large sum of money in constructing the amusements and operating them cannot give them greater rights than they would have had if the business had been less expensive.

Defendants in the court below contended, as shown by their answer and the objections and exceptions filed to the master's report, that they had a right, in a lawful manner and consistent with the peace and quiet of the neighborhood, to conduct the amusements, and that they were doing that. On appeal they contended that there was a misjoinder of defendants. That question was not raised in the court below, where defendants contended they had a lawful right to operate the park as they were doing it and should not have been enjoined. The sons of Mrs. Off, some of whom lived on the Off land, were complainants. They were trustees and remaindermen. The master found in his report that all of the defendants except one were conducting the amusements unlawfully. That was unobjected to by the defendants, and the question of misjoinder of either complainants or defendants was not raised in the court below by objections or exceptions, but defendants contended that they had a right to lawfully conduct, and were lawfully conducting, the amusements. It is well settled that a person cannot try a case on one theory in the trial court and on another in a court of review. (*Butler* v. *Miller,* 208 Ill. 231; *Davis* v. *Illinois Collieries Co.* 232 id. 284; *Lewy* v. *Standard Elevator Co.* 296 id. 295.) There was

no misjoinder if the question had been raised as to the complainants. We see no objection to the form of the decree.

Defendants express the fear that some of them who have not the right to control the amusements may be cited for contempt if those who have the control violate the injunction. Only the defendants are liable for contempt who violate the injunction, and if some of the defendants have no part in and do not approve the violation they certainly could not be convicted for contempt. Only those who violate the injunction commit a contempt. The decree is very similar to the decree the court below was directed to enter in the *Phelps case, supra.*

As it was not contended by defendants that equity had no jurisdiction to enter the decree if the proof on the part of complainants justified it, we have not deemed it necessary to cite the many authorities which are conclusive on this question. This case depends ultimately upon the evidence, which the Appellate Court thought was not conclusive or did not preponderate in favor of complainants but left the question of the nuisance in doubt. If that were true, of course the reversal was right. But we do not so understand the proof. It was more conclusive for complainants than the proof was in the *Phelps case,* which this court held was sufficient. In addition to what we have said the proof established, the testimony proved that three or more thousand people attended the amusements; that many of them came and went in motor cars, and that the number of cars in the parking space provided for them was from eight hundred to one thousand, and the coming of the cars, as well as the going especially, made noises which were very offensive to the nearby residents. The congregating near complainants' residences in the *Phelps case* of a very much smaller number of cars and the noise made by them in leaving were held to be unlawful. Besides, it was also proved by complainants in this case that numbers of people who went to attend the amusements entered on foot and

in automobiles the premises of Mrs. Off before they found the correct entrance to the amusement property. Before the amusement park was established Mrs. Off and her guests were in the habit of walking over her premises near her residence, but after the amusements began and so many people drove into her premises, walking over the premises was abandoned. The amusements were conducted until midnight of almost every day, and we think it was established beyond doubt that the noises described, some of which we have not referred to and to others very briefly, were such as to disturb the peace and quiet of complainants.

No estoppel is raised by the fact that Charles J. Off, deceased, conveyed the property, including that upon which the amusements are located, to the National Implement and Vehicle Show. The grantee was authorized to conduct fairs, etc. It is not shown that the uses made of the grounds by the grantee were of a character to disturb the peace and quiet of complainants, but if it be conceded that such use did disturb the peace and quiet of home owners, the exhibitions and fairs conducted by the grantee did not continue the year round or late every night but lasted only for brief periods, and it does not appear the use made of the land by the grantee made noises that disturbed the peace and quiet of home owners. The conveyance of a tract of land does not estop the grantor from complaining if the grantee seeks to or does use it in a manner to constitute a nuisance. *Wylie* v. *Elwood,* 134 Ill. 281.

The master's report and finding of facts were sustained by the testimony, and the decree entered by the circuit court was authorized by the law and the facts.

The judgment of the Appellate Court is reversed and the decree of the circuit court is affirmed.

*Judgment of Appellate Court reversed.*
*Decree of circuit court affirmed.*